Good morning. We have four argued cases this morning. The first of these is number 15-1266, Digital Reg of Texas v. Adobe Systems Incorporated, Mr. Genovo. Now, we've decided, the panelists decided, we're only going to hear three arguments. We don't want to hear a surrebuttal argument, so say whatever you want to say in the three arguments, as long as it's an opening argument or a reply argument or a follow-up. Okay? Very well, Your Honor. May it please the Court. The judgment this Court is asked to review arose from an obviousness determination that eviscerated the key limitations of Claim 1 of the 541 patent. Those limitations set forth the core of the claimed architecture and the separation of the functionality between the server and the client in the licensing system. At trial, Adobe introduced just a single prior art reference. It's undisputed, and Adobe's expert acknowledged at trial that that reference, the Shull reference, the 070 patent, failed to teach four limitations of Claim 1 of the 541 patent. We refer to those four limitations as the token authorization limitation, the token file limitation, the token generation limitation, and the client-generated permission limitation. Two of these were discussed in the most conclusory of fashions, not in keeping with this Court's standards for a determination of an obviousness. The remaining two, there is no evidence at all in the record for a motive to modify the teachings of Shull to meet the claim's limitations. Now, the 541 patent discloses its particular process and allocation of resources as between client and server as directed to the object of security and not passing a permission across an open network. At trial, neither Adobe nor Dr. Wicker, their sole expert, made any effort to address the teaching away in Shull that generating a password at a client poses an undesirable security risk that can expose that password to hackers. The scant and conclusory testimony of Dr. Wicker that generally offloading processing from the server to the client at some indeterminate point in time is directly contrary to the teaching of Shull, which actually teaches explicitly putting more power at the server than the client so that the client is incapable of generating a password. To ignore these four limitations, which form the crux of Claim 1, would violate the case law of this Court and would have potentially far-reaching implications to the strength of all U.S. patents. I'd like now to turn your honors to each of the individual limitations, starting with the token authorization limitation. The token authorization limitation was construed by the Court to indicate whether the transaction has been approved and access should be granted and, importantly, does not simply indicate that access should be granted, but also contains a yes-no indicator exhibiting either approval or rejection of the transaction. The defendants, including Adobe, urged the adoption of this construction. At the hearing, the parties consented to the Court's suggested modification, and the Court's construction in its own words makes clear that a token does not indicate simply that access should be granted, but also contains a yes-no indication. So looking now at the testimony that was provided by Dr. Wicker, Adobe's sole expert, first of all, and this is true of all the four limitations, but I'll provide the citations to the record, Wicker admits that this was not present in the Shull reference, specifically verbatim, there is no indication, yes or no, that access is granted. So what was his testimony that there would have been a motivation to modify Shull in this regard? I read verbatim, okay, well, basically, I think it would have been obvious to create a yes-no indication. That's it. Adobe provided no other evidence with respect to this missing limitation. I think, frankly, it's difficult to conceive of a more conclusory statement than simply saying it would have been obvious. And this is all… Why is there not a yes-no indication in a digital system that presumably, you know, works with ones and zeros? Why would the password not have a yes-no indication? Yes, Your Honor, so it is true that a computer expresses itself in a binary format, but there are multiple ways that a communication can occur, and this is an important question, and the reason I stress that, Adobe basically says as long as there's a server-client communication, then that meets the requirement of a token. But the Court was very clear in its Markman order to point out that it's not any communication, and it can't be a simple affirmance. It has to be yes-no. In other words, yes doesn't count. That's correct, Your Honor. So you're distinguishing between a yes and a yes-no. And also distinguishing, Your Honor, the teaching of Shull. Yes? Yes, I am, Your Honor. And also the teaching of Shull, which is… The teaching of Shull was you have a password that's sent from the server to the client, and then the client generates… This is the teaching away. The client generates another password and compares the two. So it's neither a yes nor an oh, or either. It's simply a password generated here and a password generated here do the two match. So there are multiple ways that the computer system… And if they match, you get access. That's correct, Your Honor. There's a yes. It is interpreted as a yes. Alternatively, the client could be autonomous, which, in fact, is how many of the systems with which we operate commonly are. You enter your code. And as we'll get into, the way Shull operated, he had a code that was intended to be alphanumeric in a manner that could be given orally over the telephone, and the user could enter it. So it is true, Your Honor, that a computer token, any sort of communication will be expressed in a binary format, but it would not necessarily meet the construction of a court. I was just going to say at a high level, Dr. Keller agreed with their expert on all of these that they were missing from the reference. So all of the experts agreed that these were missing. The second one that I'd like to address is the token file limitation, a token that is a file. Here there was no evidence whatsoever regarding the token file limitation. There was a dispute in the briefing about whether Dr. Wicker admits this. And I will read the questioning from their own lawyer on direct. Now, in terms of the claim construction for token, you understand that requires a file, right? Yes. Now, you're not contending that the Shull reference itself discloses a token. Answer, that's correct. It does not. And Professor Shull himself agreed that the string, the password, which, of course, doesn't meet the other requirements of a token anyway, as we'll get into, but the password is a string. That's not a file. And Dr. Wicker agreed with his earlier deposition testimony that a string could not satisfy the file limitation. It was Adobe's burden to show that this was obvious, and it did not do so at trial. The token-based permission limitation. Similarly, no evidence adduced at trial. Dr. Wicker testified that, and I quote, generating a permission based on the received token, there is no yes-no indication sent from the server to the client that is used to generate the permission. Shull doesn't describe that. No testimony in the record of a motivation to generate a permission based on the received token. And the salient point here is that the token and the permission are different. In Shull in Figure 1, you'll see that the password's sent, the password's installed. Finally, the client permission limitation. Excuse me, the client-generated permission limitation. Here again, Dr. Wicker says Shull doesn't generate the permission at the client. Shull does the generation at the server. And this is where he has his teaching or his motivation. In earlier years, complexity was an issue at servers, and there has been an effort over time to try to push out some of that functionality. He doesn't specify when. He doesn't even specify which functionality there would have been a motivation to push out. Is it all the functionality of Claim 1? Is it only aspects of it? Most importantly, he doesn't address the security concern of the 070 patent in any way. And that security concern is that, this is from the language, if it was stored at the client, it might be discovered by hackers seeking to breach the system. As a consequence, it's an undesirable feature and shortcoming that would be eliminated if the programmer's program were capable of validating but not generating a password. The Dupuis-Spine case, as well as other cases, say an inference of non-obviousness, is especially strong where the proper reason or motivation from their expert is directly contrary to what the reference they're relying on teaches. Does the shield itself tell you how to solve the security problem? It does not, Your Honor. Well, it has a distinct approach, a totally distinct approach. The approach there is to put the functionality at the server and to encrypt the functionality and store that same password at the client. The approach described in the 541 patent is to pass a token that has this yes-no indication and to generate it. So it does recognize the security problem and solve it? It does recognize the security problem and it says specifically not to generate it at the client because hackers can get into it. And there's a second teaching way that I'd like to... So it shows that it could be generated at the client and the security problem could be solved, right? No, it does not. The way that they suggest the security problem being solved is not generating it at the client. Did Dr. Ricker testify that the shell reference actually contemplates addressing that at the client? Did the jury hear that testimony? They did. He said that they did, but he also acknowledged that it was undesirable and a shortcoming. So he, of course, in order for there to be a teaching away, there has to be a statement in the record that it's possible to do something and then to teach away from it, and that's precisely what it did. Isn't this a substantial evidence question? We're supposed to look at whether there was substantial evidence to support the jury verdict? That's correct, Your Honor. And so that Dr. Ricker explained that the shell reference contemplates generating at the client. There was evidence that the jury could rely on for that teaching, right? But according to the Dupuis-Spine case, the Eli Lilly v. Teba case, the Leo Pharmaceutical case, when the expert doesn't just have to acknowledge the teaching away, he or she has to actually explain why a person of ordinary skill would have been motivated, notwithstanding the criticism and detraction from that approach, to proceed in that direction. And there was no acknowledgment of the teaching away, nor was there any explanation for why the approach would have been taken nonetheless. And didn't Dr. Shull himself testify? He did, Your Honor, and he testified that he would not do it this way. Where is that in the record? Dr. Shull testified. I can get you the precise quote. It's around A10585. But I am certain that he stated that they did not generate at the client as a matter of security. But does something teach away if it is described as acceptable? What is described as acceptable is a different system, actually. What he described as acceptable was sending this password and then generating a second password and seeing if they match. I thought that the Shull patent described generating the password at the user as being acceptable but undesirable. That's correct. But he was specifically characterizing a system where the password was sent, and then there was a password generated at the client, and there was a check for a match. It's very different than the token generation system. That's a different point. You're arguing that because it characterized the thing as undesirable, that that's a teaching away. But is it a teaching away if it's acceptable but undesirable? Yes, it is, Your Honor, because the case law says that if it's criticized or if one would have been deterred from going in that direction. And allow me if I could just— There's no teaching away if something is characterized as a less preferred route or option. Well, he went on beyond—I agree, Your Honor, there is that case law. But he went beyond that. He said not only is it undesirable, it's a shortcoming. It should not be done because it exposes the algorithm to hackers. And he went on to make a further teaching away that is precisely contrary to Dr. Wicker's testimony, namely that in order to prevent the user system from generating the password, it should be ensured that the licensing system is substantially more powerful than the user system. And this is at the 070 patent, column 9, lines 9 to 12. And he even went so far as to claim it as part of his invention. In claim 15 of the 070 patent, the method according to claim 13 wherein said licensing computer is so much more powerful than a user system that it is practical for said licensing computer but not for a user's computer to generate a password for a given ID, whereby said— You're getting into your rattle time. Do you want to save it? Well, that concludes my remarks unless there are further questions. Thank you, Your Honor. Okay. Thank you. Thank you. Mr. Reines? Thank you very much, Your Honor, and may it please the Court. There's essentially three arguments that we heard. The first is that the idea of moving the password generation from the server to the client and then using a yes-no indication from the server to the client to say, okay, now we've gotten payment or authorization. You should go ahead and generate the password at the client. That's one argument. This is general motivation to do that. The second one is, which we didn't hear that much about, is that they're somehow inventive to use a file for the transfer of the yes-no indication. And the third is that it's somehow inventive to use a yes-no indication. With respect to the motivation to move the permission generation to the client, there was stark testimony that goes on at length of Professor Wicker that was unrebutted, that's substantial evidence, and for which all reasonable inferences should be given, that says you'd want to move functionality from servers to clients at the relevant time. It was not contested by anybody. So the motive to move it is clear. What we're hearing now more than we heard at the trial is that there's this security concern, which was not an argument that they made at the time as a teaching away to the jury. But the first point about that is it doesn't pass the common sense test, which is why would transferring a yes-no indicator in a file from the server to the client be any more immune from hacking than sending a password? If you could just have a one-bit yes-no, you could send that from one place to the other. So there's no security advantage. It's easier to mimic a single bit. The second point, which goes to Your Honor's question about is the digital system a yes-no, if you actually look at the patent, which is always handy in terms of the preferred embodiment, to understand what is this yes-no indication so we know what the token is, it's in column 10 at line 45. It's a single bit. There's a 128-bit packet, and the first bit is if it's a one, it's a yes, and then the rest are dummy bits, meaning garbage. And if it's a no, then there may be some additional information about what the no was for the rejection. But the yes-no is just a single bit. So the idea that a single bit is inventive, that you would say yes or no, there's been authorization, please set the password, just doesn't square with the teachings of KSR about common sense. In terms of the Schultz teaching away, which is where I think most of the effort was invested to try to show a legal error in this case, Your Honor was correct that Schultz says an acceptable but undesirable feature is the password generation, and that is clear with the law. In fact, Schultz claims the password generation at the client. So he's saying, look, it's not great to have the client have this control over it, but you can do things with encryption and otherwise to protect it, and you don't want to do it, but if you have to do it, you can do it. That's a teaching in the prior art of doing something. And under the substantial evidence test for a jury verdict, it would be hardly something to oppose. I think obviously it's our burden, and the last thing I want to do is shirk the burden to prove invalidity and obviousness, and obviously the jury didn't think we did it, and Judge Wilkin didn't think we did it when she reviewed that, but it is telling that they're a validity expert. They had a dedicated validity expert, did not make any of the arguments that you hear. He did not argue that Schultz teaches away. He did not argue that there would be any reason you wouldn't want to move from the server to the client. He didn't argue that you'd care about confidentiality of a password more than you would a single bet. None of these arguments were supported at all by their own expert. On top of that, there was no secondary considerations. We went through and rebutted every secondary consideration in case they made the argument, and their expert made none, and apparently oral argument doesn't include the one that they think there was an error of the evidentiary decision on that point. Given the testimony of Professor Wicker that moving this functionality from the server to the client was well within the ability of the person skilled in the art, and that's at A12159 and was neglected by my friend, which is people know how to move the password generation from the server to the client through the use of a single bet or even a 128-bit package that goes over the line, and there was no contest. In fact, I don't even think there are appeal questions whether all of these technologies, the yes, no indicator, and then putting it in a file, that those were known and basic technologies at the time. That's not even really, I don't think, what they're contesting. They're saying somehow someone wouldn't have done that, but we have our experts saying it is well within their capabilities, and then saying there are reasons why you might want to offload complexity from the server, especially in the earlier years, and under the deferential standard, I just cannot envision that that would constitute substantial evidence. I don't need to take your valuable time unless there's a question. I guess the one lingering issue, which they didn't push here, but I want to just nail is the idea that putting this yes, no indicator in a file would be their invention. I mean, in all this complexity, the patent, it doesn't say the file is important. I'm not even sure it mentions file in the summary. It's not even clear that moving the password generation was at all the invention if you look at the summary of the invention section. But the point about the file is that Professor Wicker said point blank, this is at A12194, if I'm transmitting over the Internet, it is a file. He said that's what you would use. What else would you put in? What would you put the bit in? And I just really think it's asking too much to suggest that it's an invention to use a file, which is one of their independent arguments, to carry the yes, no bit. They made an argument in their reply that somehow the yes, no indication has to be the file, not in the file. I didn't hear that now, and it doesn't make any sense as to how it would be the file as compared to being in the file. I think in this context. You didn't raise 101 on this case? No, we didn't, Your Honor. It might have been an appropriate thing to do, but we had 25 pages for summary judgment, and there were seven patents and seven defendants, and we had to make our choices. But no, clearly 101 would be potentially implicated, but we just think that the idea that use of the file, use of the yes, no, or the idea of moving the generation from the server to the client, given the expert testimony, and I've got it, it's not just one or two things. It goes on, and I'm not going to read into the record because it's not in the interest of everyone's time, but you can find that, and it's in our briefs, and he explains it in detail. Let me just talk a little bit about the cross-appeal. I realize, especially having established two grounds of exceptional case that I see. There seems to be a tendency these days to bring a lot of these appeals from the denial of attorney's fees, and the bar doesn't seem to realize that Highmark cuts both ways, that the denial of fees is reviewed under a very deferential standard, too. No, I mean, the point is well taken, and Adobe has, to my knowledge, I shouldn't say that because I don't know well enough, but let me say this. This wasn't a reflexive, we lost on one ground and two grounds are removing. As a point out, we're not moving on all the grounds, but I think it's important for me to sensitize the panel as to why we took what I agree is an unusual step of challenging an abuse of discretion. It doesn't seem to be so unusual these days. Well, actually, this is my point actually going the other way, which is the essential defense. I mean, if you look at the damages opinion here, it is an atrocity, and I'm dragging you through, but they violated the entire market value rule, the 50-50 rule. It was inherently unreliable, and most cynically, they had— Making bad arguments led to attorney's fees. There would be attorney's fees in almost every case. Understood, and let me get to the heart of it, which is their defense to this claim. This is not just a bad argument. I think it's so far beyond that, but their argument is everybody's doing it. They cite a PWC study, which I had to just—I went and read right away. I couldn't believe it. It said over 50% of financial damage expert reports, over 50% from 2001 to 2013, are invalidated on DABRA. Over 50%. That's an epidemic, and the reason why it's not just a bad argument like someone might make to you on a claim construction argument where you have to sit through it here and you don't want to sit through it is when you were facing a damages report up to trial, first of all, it creates exposure, and then you have to decide, am I going to challenge it or am I going to face a do-over during trial and scramble it? And then I know in some courts, people fear that because the damages report gets better because the proponent then has all of the information from the entire case and up to trial to tailor it. And so it puts incredible costs. In this case, I had to take depositions during the trial. We had to write two liminees during the trial to strike reports. It's incredibly costly, and I think it's very important, and I'd ask just a fresh look, that the epidemic of overreaching damages reports coming up to trial is a big problem, and that's why Adobe's— If you'd have brought the 101 issue, you wouldn't have had all of this, would you? Well, we would have at least had to go through the whole case because the judge, she sets a time when she hears summary judgment, and frankly, the case is rather old, so a lot of the emerging law that encourages early 101 resolution, and it was well pre-Alice and so forth, so it wasn't like that was going to be tolerated, to be honest. So we couldn't bring it very early, and we had six other patents to deal with, and so we just had to use up—we had one 25-page brief for, I think, for many parties with different arguments on all these different areas. But doing it over again, I'm sure that would have been given closer consideration. Keep in mind also the pleadings were closed originally in Texas, where the arguments may not have been as successful as the court might anticipate. But it's not just this case. The Raylon decision, Your Honor, does say, which is a sensible decision, there is an endpoint where a weak position does not deserve to be heard, and someone needs to say there's an irreducible floor beneath which we won't go, and where it imposed so much cost on the system, where they're the ones that are saying, don't blame us, everybody's doing it, more than 50 percent of the reports are stricken. That's their argument. That's page 52 of their reply. They're actually making that argument. Let me say what I think, other than violating all these other rules, what's most offensive about their expert report. Just indulge me, and then I'll sit down. Their argument is that they save on piracy. So they're saying, our technology saves on piracy of your software. So we want a piece of the action for it. All the sales you would have made but for the piracy. How do they show what our piracy is that we saved from their patent? They first start with the baseline of 20 percent. Without our patent, it's a 20 percent piracy rate in the world on software. And they cite studies from 2006 to 2010. It says standard rate for software piracy is 20 percent. That makes no sense. They're saying that their patent was infringed in 2007. They filed suit. They signed licenses with Apple and Microsoft. They accuse us of infringing the law before 2010. They're saying their patent was from the 1990s. They're saying everyone's been using this concept. They've got six more lawsuits pending right now. Or seven. Six, I think. New suits after the invalidation asserting this patent. They're saying everybody's using this software. They still believe it, this piracy savings technique. Their baseline is 20 percent. Then they take a deposition comment from Symantec, a different party lawyer from later today. And they say this person says Symantec's experiencing a 6 to 10 piracy rate. So they say, well, Symantec must be using the invention. So you take the 20 percent, which had no basis, and you take the 6 to 10 percent, and that's the piracy savings rate that Symantec had. They don't show Symantec used the patent. They settled out. They didn't show Symantec ever had the 20 percent initial rate. They don't show that the time of the 6 to 10 percent was after the 20 percent that was supposedly established before. They show nothing. It's completely thin. And then they say, well, since Symantec saved 14 percent or 10 percent or whatever it is, you did without showing why Symantec was in a different field would be the same as Adobe. All of these assumptions are garbage. And you put on top of that the violation of the entire market value. And then the most cynical of all is what I call the seesaw argument that you see out there in a lot of these 50 percent, which is, well, if you're going to make me reduce the base, then I'm going to increase the rate so I get the same number. Explicit of their expert. Why did you increase the rate? Well, because I lowered the base. After this court said you can't do that. You can't just seesaw it. And it's not like this is a low-end expert that they couldn't find anyone and they're hard done by. This is a licensing operation that someone who they told the jury wrote the book on royalties. So he wrote the book on royalty damages and patent cases. And it's a damages report like this. And I'm taking depositions mid-trial and dealing with a new report and so forth. And I just don't think that should be tolerated, especially. All right. Thank you. First of all, Judge Stoll, I'd like to give you that citation that you had asked for. It's A1213718 to 121389. And Professor Schull says, we saw to it that the client could request passwords from the server, but it couldn't generate valid passwords on its own. And there's some context around that. What about the language A12118 where Mr. Schull said, and if one wanted to move the permission generation process from the server to the user, would it be difficult to do that? And he said, no, you would just move the code that runs on the server into the client. That doesn't sound like he thought it was difficult. No, he didn't think it was difficult to do that. He thought it was a bad idea. And this is just one of the four limitations that are missing. But he taught away directly that it was unadvisable to do that because it exposed the system to hackers, and he directed people not to do that. And there's explicit teaching in the patent against doing that. And that, I think, dovetails nicely into my concluding remarks, which is we basically heard Counsel for Adobe talk about how he thought the first three limitations weren't inventive. But that's not why we're here today. What we're here today is to evaluate what the record at trial was and whether there was substantial evidence that there was a motivation to modify their single prior art reference or not. And he pointed to no evidence. We put every word of their expert in our briefing to avoid this sort of characterization that just occurred. And you will see that there's no discussion of motivation, and he adduced none today, pointed the court to none. There is this issue. Thank you. We're out of time. Thank you, Your Honor. Thank both counsels. Please submit.